IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 16, 2008

Charles R. Fulbruge III
Clerk

_____

No. 06-30196
_____

IN THE MATTER OF LISA C. BAYHI,

Debtor

-----------------------------------------

ROBERT N. AGUILUZ,

Appellant

v.

LISA C. BAYHI,

Appellee

-------------------------
Appeal from the United States District Court
for the Middle District of Louisiana
-----------------------

Before JONES, Chief Judge, and WIENER and BARKSDALE, Circuit Judges.

WIENER, Circuit Judge:

In this appeal, we are called on to determine whether the bankruptcy court (and district court, in affirming the bankruptcy court) impermissibly vacated a state court judgment, enjoined further state court litigation, and held Appellant Robert N. Aguiluz in contempt, pursuant to United States Code, Title 11, § 524(a). Concluding that the state court judgment was not "a determination of the personal liability of the debtor with respect to any debt

discharged,"[1] we reverse, vacating the orders of the bankruptcy court and district court and remanding to the bankruptcy court with instructions.

## I.  FACTS AND PROCEEDINGS

Aguiluz and Appellee/Debtor Lisa C. Bayhi were married in Louisiana under a community property regime in March 1979.  No separate property agreements or orders were entered into or made prior to or during the existence of the marriage.

While they were still married to each other, the parties obtained several student loans through the Student Loan Marketing Association ("Sallie Mae"), which were guaranteed by the United States.  The couple consolidated several of these loans into a single loan ("the Loan") in 1993.

Both parties now acknowledge that the Loan created a community obligation under article 2360 of the Louisiana Civil Code.  In addition, both parties acknowledge that they were and remain solidarily liable for the entirety of the Loan.[2]

The nature of their solidary liability is that of equal principals, not principal and surety — a distinction that shall be shown to have significance.[3]  As the obligee of solidary co-obligors, Sallie Mae could demand full performance on the Loan obligation from either party or from both simultaneously.  Irrespective of whether Sallie Mae has or should ever demand such performance from either Aguiluz or Bayhi alone, and irrespective of whether either co-obligor has or has not paid anything

---

[1] 11 U.S.C. § 524(a)(1) (emphasis added).

[2] Liability in solido is the Civil Law analog of joint and several liability in the common law.  Tinsley v. Packard Truck Lines, Inc., 846 F.2d 334, 336 n.3 (5th Cir. 1988).

[3] See infra notes 6, 35-37 and accompanying text.

toward the other's "virile portion" on the Loan,[4] either party may have compelled (and at any time still may compel) "contribution"[5] — not payment to themselves but directly to Sallie Mae — for his or her virile portion.[6] As there are here but two solidary co-obligors, the virile portion of each is one-half of the Loan obligation.[7]

In August 1995, the parties separated. Their marriage was subsequently terminated pursuant to an April 1996 judgment of divorce.

In November 1996, the parties entered into a community property settlement agreement ("the Agreement"), which was filed in the public records for the Parish of East Baton Rouge, Louisiana. The stated purpose of the Agreement was "to settle and liquidate [all remaining] community debts and to separate certain community property items . . . ." As to each

---

[4] La. Civ. Code Ann. art. 1804.

[5] La. Civ. Code Ann. art. 1805.

[6] La. Civ. Code Ann. art. 1804. "Contribution" is owed ab initio among those solidary obligors who are principal or primary co-obligors to their common obligee, differing from "reimbursement," which is owed by a principal or primary solidary obligor to a secondary co-obligor, such as a surety, only after paying or performing on the debt principally owed by the debtor; see La. Civ. Code Ann. arts. 3047, 3049. The dissent's description of Aguiluz's action to compel contribution directly to Sallie Mae as a "novel situation" or "novel questions," and statement that he is given some "special position as a co-debtor on a non-dischargeable debt," is true only to the extent that, almost universally in the jurisprudence, the co-debtor who seeks contribution has paid some or all of the other co-debtor's virile portion and is trying to recoup monies paid. But nothing requires that: A debtor like Aguiluz has the option, via declaratory judgment and specific performance, to compel his co-debtor to pay her virile share directly to the creditor. As shall be demonstrated below, for contribution (as distinct from reimbursement), relief can never be deemed prospective once the obligation comes into existence; payment by one co-obligor of the other's virile portion to the obligee is not a prerequisite to the enforcement of the right to contribution even though payment is a prerequisite to recover monies previously paid, as was the case in every case cited by the dissent in footnotes 2 and 3.

[7] La. Civ. Code Ann. art. 1794; see also La. Civ. Code Ann. arts. 1805, 1829(3) and (5).

3

community obligation other than the Loan, the parties assigned sole responsibility to one or the other.

As to the Loan, however, Paragraph IV of the Agreement stated that the parties "agree to split the Sallie Mae Consolidated Loan, each to pay one half (½) the monthly payment until the debt is paid. At any time, either party may relieve his [sic] or herself of this obligation by paying one half (½) the outstanding principal at the time such payment is made." No effort was made to revise or modify the Loan (hence no novation),[8] or to partition it into two separate debts;[9] Sallie Mae could still demand full performance from either party. Thus, each party's right to contribution inter se remained the same as before they executed the Agreement — either co-obligor was entitled to enforce contribution from the other for one-half of the Loan obligation — prospectively, in arrears, or both.[10]

In September 1999, Bayhi filed for bankruptcy protection under Chapter 7. She listed both Aguiluz and Sallie Mae as creditors, but each with

---

[8] See La. Civ. Code Ann. arts. 1879, 1880.

[9] Again, we respectfully suggest that the dissent's characterization of Aguiluz's state court action (discussed below) as effecting "a de facto partition of the Sallie Mae liability from his standpoint" misapprehends the suit and the judgments he obtained in that court. The dissent also fails to recognize that any fact pleading required of Aguiluz as to payments he might have remitted to Sallie Mae for Bayhi against her non-virile portion of the Loan would have been pled in state court, not here —— and would merely affect the calculation of her payments, not her duty vel non —— but only if Aguiluz were seeking to recoup monies paid, not specific performance, the only thing he has sought — so far — in state court.

[10] See supra notes 4, 5, and 6, and accompanying text.

claim amount of "$0.00."[11]  A short two months later, the bankruptcy court granted Bayhi a general discharge under United States Code, Title 11, § 727.

Aguiluz did not object to Bayhi's discharge, did not file a proof of claim, and did not seek to except any debt from discharge; and neither did Sallie Mae![12]  Consequently, any debts that Bayhi owed to Aguiluz were discharged. Both parties agree, however, and the law acknowledges, that the discharge did not release Bayhi from her solidary Loan debt to Sallie Mae, as this debt was expressly exempted from discharge by one of the self-executing exceptions of the Bankruptcy Code, specifically, § 523(a)(8).  As shall be seen in our discussion of In re Fields below, debts like state taxes and student

---

[11] Because Bayhi had been current in her payments to Sallie Mae up to the time she filed her bankruptcy petition, the "$0.00" amounts were correct, from her standpoint and theirs.  The dissent nevertheless attempts to invoke 11 U.S.C. § § 101(5) and 502(a) to support the proposition that Aguiluz was required to appear in the bankruptcy court to assert his rights to contribution.  As shall be seen infra in our discussion of In re Fields, 926 F.2d 501 (5th Cir. 1991), accompanying notes 39-47, that attempt fails when, as here, the very existence of the "claim" is tied to the solidary subrogation to the rights of the creditor/obligee on a non-dischargeable/undischarged obligation —— here, the one to Sallie Mae.  Moreover, had Aguiluz asserted his "claim" to contribution in the bankruptcy proceedings (like Sallie Mae's "claim," his had been listed by Bayhi as "$0.00") via subrogation of their non-dischargeable solidary debt to Sallie Mae, and had the bankruptcy court purported to discharge Aguiluz's right to contribution, we would reverse that ruling today.  For, as acknowledged by the dissent, Aguiluz would be standing in Sallie Mae's shoes via subrogation in seeking to recoup monies he paid on Bayhi's virile portion, which in turn would assure that there could be no double payment by Bayhi post-discharge and that not one cent of payment would come from assets of her bankruptcy estate.

[12] The dissent would rely on the generalities of 11 U.S.C. § 502(a) for the proposition that Aguiluz had a "claim" against Bayhi's bankruptcy estate and that his failure to pursue contribution in those proceedings bars recovery.  This not only ignores the fact that Aguiluz's "claim" is for his correlative right to contribution under Sallie Mae's per se non-dischargeable debt, but also ignores 11 U.S.C. § 502(e)(1)(B) which only disallows a claim of reimbursement or contribution to the extent that "such creditor's [Sallie Mae's] claim against the estate is disallowed."  As the creditor's claim here is not disallowed but is expressly non-dischargeable, § 502 does not disallow Aguiluz's claim for contribution.  See 4 COLLIER ON BANKRUPTCY ¶ 502.06[2][c] (15th ed. rev. 1996).

5

loans, which are per se non-dischargeable, need not be claimed in bankruptcy proceedings to remain completely immune from discharge.

Even though, following her divorce and continuing after the execution of the Agreement, Bayhi had contributed her half of the periodic payments to Sallie Mae, she ceased making payments to Sallie Mae altogether when she filed her bankruptcy petition in 1999. This non-payment continued for the two months between that filing and the entry of the discharge order, and has continued for almost a decade since that time.

In February 2000, Aguiluz wrote to Bayhi's then-counsel requesting an explanation for Bayhi's failure to make her half of the periodic Loan payments. After receiving no response, Aguiluz filed a petition for declaratory judgment in state court[13] in which he sought judicial recognition that the Loan debt owed to Sallie Mae was originally a community obligation and thus solidary. Eventually, Bayhi stipulated to this, and the state court entered a judgment to that effect in June 2001.

Despite entry of this judgment, however, Bayhi still did not resume paying her half of the Loan payments to Sallie Mae. So, in December 2001, Aguiluz filed a petition for specific performance in state court in which he sought an order mandating that Bayhi pay her half of the payments to Sallie Mae pursuant to the post-bankruptcy June 2001 judgment of the state court.[14] Importantly, Aguiluz did not allege that he had made her payments and did not seek to recover any such amounts through contribution: He sought only to force her to pay her virile portion directly to Sallie Mae.

---

[13] See La. Code Civ. Proc. Ann. arts. 1871 et seq.

[14] See La. Code Civ. Proc. Ann. art. 2504.

6

Unable to resolve that litigation amicably, Aguiluz filed a motion for summary judgment almost three years after initiating the action. Following oral argument and supplemental briefing, the state court granted Aguiluz's motion and entered judgment in his favor in February 2005, directing Bayhi to resume making half of the Loan payments directly to Sallie Mae (no mention of repaying Aguiluz). This was more than five years after the closing of her bankruptcy case, during which time Bayhi had paid nothing to Sallie Mae, despite the non-discharge of her solidary liability on the Loan.

The state court's order did not quell Bayhi's penchant for litigation: In March 2005, without prior notice to Aguiluz, Bayhi filed ex parte motions in the bankruptcy court to reopen her case pursuant to United States Code, Title 11, § 350(b) and to hold Aguiluz in contempt and sanction him. Bayhi contended that Aguiluz had knowingly and willfully violated the bankruptcy court's discharge order by seeking to force her to make her share of the payments to Sallie Mae on the undischarged Loan obligation. Bayhi took the position that it was the Agreement that had created a pre-petition debt from her to Aguiluz, which was separate and distinct from their solidary debt to Sallie Mae and from their correlative rights to contribution. Bayhi advanced that, as all her debts to Aguiluz were discharged, his state court actions were in violation of the discharge order.

In response to Bayhi's motions, the bankruptcy court reopened the case and scheduled a show-cause hearing for contempt and sanctions. At the conclusion of that hearing, the bankruptcy court stated for the record that it found Aguiluz to be in contempt of court, but the court did not sanction him. Without specifically mentioning the Loan and its pre-divorce creation of the parties' solidary debt to Sallie Mae, the bankruptcy court ruled that it was the post-divorce Agreement that created Bayhi's obligation to pay one-half of

7

each installment on the Loan and Aguiluz's concomitant right to recover for any payments that he might ever have to make toward her share.  The court expressly ruled that the obligation created by the Agreement was a "debt" that Bayhi owed to Aguiluz, presumably separate and distinct from the debt that the former spouses still owed to Sallie Mae in solido.

The court further ruled that Aguiluz's failure to file a § 523(a)(15) exception to the discharge of this Agreement-created "debt" allowed it to be discharged.  Finally, finding that Aguiluz was acting neither on Sallie Mae's behalf nor as its subrogee or assignee, the court concluded that Aguiluz's actions were an attempt to preserve his own claim, in violation of the discharge order.  After giving its reasons orally, the bankruptcy court concluded with:

> That's it.  That concludes this matter.  Mr. Grand [Bayhi's counsel], you need to submit a judgment.  I suggest you communicate with Mr. Aguiluz [acting pro se] on the terms of the order with regard to the breath [sic] of what can and what cannot be done in state court.  If you all cannot reach an agreement on that, you can call me and we'll have a status conference or we'll have another hearing.

On March 21, 2005, the bankruptcy court entered a written minute entry directing that the parties "will communicate to agree on" a jointly proposed order.

Notwithstanding these clear instructions, then-counsel for Bayhi submitted an ex parte proposed order on March 31 without ever having communicated with Aguiluz and without apprising the bankruptcy court that counsel had not done so.  Understandably presuming the order to have been agreed on by both parties, the bankruptcy court signed and entered it that same day.  On April 11, after he became aware of this unprofessional conduct

8

by Bayhi's counsel, Aguiluz filed a motion in the bankruptcy court to alter or amend its order. Following briefing and a hearing, the court obliged, entering an amended order on July 1, 2005.

Pursuant to § 524(a), the bankruptcy court's amended order held Aguiluz in contempt (but did not assess sanctions), enjoined him from taking any action to collect Bayhi's share of the Loan payments, and vacated the February 2005 state court judgment (which had ordered Bayhi to make her payments to Sallie Mae, not to repay anything to Aguiluz). Aguiluz properly appealed this order to the district court.

In her appellee brief to the district court, Bayhi contended that the bankruptcy court had correctly decided the case as a matter of law and also asserted that Aguiluz's appeal was untimely. Without ever deciding the timeliness issue, the district court affirmed the bankruptcy court's order for the same reasons that the court had given orally. Aguiluz timely filed a notice of appeal to us.

## II. LAW AND ANALYSIS

### A.    Timeliness

Although raised by neither party on appeal, we note sua sponte, as we must, that there is an unanswered question as to our jurisdiction — whether Aguiluz timely filed his notice of appeal of the bankruptcy court's judgment to the district court. Thus, before reaching the merits of this appeal, we must first determine whether we have jurisdiction.

Under Rule 8002(a) of the Federal Rules of Bankruptcy Procedure, a party seeking to appeal a bankruptcy court's judgment to a district court has ten days following entry of the bankruptcy court's judgment to file a notice of

9

appeal with the bankruptcy clerk.[15]  Failure to file a notice of appeal timely deprives the district court of jurisdiction to consider that appeal and, in turn, deprives us of jurisdiction to consider an appeal from the ruling of the district court.[16]  Given its jurisdictional nature, this requirement cannot be waived.[17]

In his brief to the district court, Bayhi's lawyer asserted that Aguiluz's appeal clock started to run on April 1, 2005, and that his notice of appeal was filed on August 3, 2005 and thus was untimely.  Both assertions were unprofessionally incorrect.

Rule 9023 of the Federal Rules of Bankruptcy Procedure, which references Federal Rule of Civil Procedure 59, allows a party ten days from entry of judgment to file a motion to alter or amend that judgment.[18]  If a party timely files such a motion, the time for filing a notice of appeal will not commence to run until the entry of the order granting or denying such motion.[19]

Here, the bankruptcy court entered its initial order on March 31, 2005. Aguiluz filed his motion to alter or amend on April 11, which might appear to be eleven days after the order; but, as April 10 was a Sunday, Aguiluz had until the next day to file his motion.[20]  Therefore, the running of Aguiluz's

---

[15] Fed. R. Bankr. P. 8002(a).

[16] In re Don Vicente Macias, Inc., 168 F.3d 209, 211 (5th Cir. 1999).

[17] Abraham v. Aguilar, 861 F.2d 873, 874 (5th Cir. 1988).

[18] Fed. R. Bankr. P. 9023; Fed. R. Civ. P. 59(e).

[19] Fellows v. Colonial Savs. & Loan Assoc., 19 F.3d 245, 245-46 (5th Cir. 1994) (citing Fed. R. Bankr. P. 8002(b)).

[20] Fed. R. Bankr. P. 9006.

time within which to file a notice of appeal to the district court was tolled until the bankruptcy court acted on his alter-or-amend motion.[21]

On July 1, 2005, the bankruptcy court entered its amended order. In turn, Aguiluz filed his notice of appeal with the bankruptcy clerk on July 11. As the day of entry is not counted, July 11 was the tenth day after entry of the amended order.[22] Thus, Aguiluz's appeal to the district court was timely, and we have jurisdiction to address the substance of this appeal.

B.    Abstention

The bankruptcy court was not authorized to vacate the state court's five year-old judgment. Under the Rooker-Feldman doctrine, the lower federal courts are without any authority/power/jurisdiction to modify or reverse a judgment rendered by a state court.[23] Although there is an exception that allows vacatur of a state court judgment that violates a discharge order,[24] we demonstrate infra that the state court judgment here did not violate the bankruptcy court's discharge order for the obvious reason that the solidary debt to Sallie Mae that produced Aguiluz's contribution right was not discharged. Thus, as the discharge exception to Rooker-Feldman is inapt, the

---

[21] Even if Aguiluz had not timely filed his motion to amend or alter, we might have determined sua sponte that the artifice of Bayhi's counsel warranted a vacatur of the bankruptcy court's initial order, nullifying its effect on the timeliness of Aguiluz's notice of appeal. Fed. R. Bankr. P. 9024; Fed. R. Civ. P. 60(b).

[22] In the district court, Bayhi's counsel argued that Aguiluz filed his notice of appeal on August 3. The bankruptcy clerk transmitted the record on appeal to the district court clerk on that date. Despite his track record in this case, we give Bayhi's counsel the benefit of the doubt and assume that he merely confused the effects of the clerk's transmittal of the record with the appellant's filing of a notice of appeal. It goes without saying that a clerk's record transmission has no effect on the notice of appeal and is irrelevant to the timeliness of an appeal.

[23] See, e.g., United States v. Shepherd, 23 F.3d 923, 925 (5th Cir. 1994).

[24] Reitnauer v. Texas Exotic Feline Found., Inc., 152 F.3d 341, 343-44 (5th Cir. 1998).

11

state court's judgment — correct or not — is immunized by that doctrine from vacatur or any other restraints by the bankruptcy court, the district court, and this court.

C.    Merits

1.    Standard of Review

We review a bankruptcy court's findings of fact for clear error and its conclusions of law de novo.[25]    When a district court has affirmed the bankruptcy court's factual findings, we will reverse only if we are left with the definite and firm conviction that an error was made.[26]

2.    Applicable Law

If a claim for payment were to be asserted against Bayhi by Sallie Mae post-discharge, the Loan would be collectible from her because it was per se non-dischargeable under 11 U.S.C. § 523(a)(8) and nothing in § 523 required Sallie Mae to file a claim to determine non-dischargeability.  Here, we must decide whether Aguiluz's right to seek contribution stems from (1) the parties' undischarged debt to Sallie Mae or (2) as the bankruptcy court ruled, from the Agreement's putative creation of a separate and distinct pre-petition debt owed to him by Bayhi and subsequently discharged.

When it vacated the state court judgment, enjoined Aguiluz from seeking contribution of Bayhi's virile share of the Loan payments, and found Aguiluz in contempt, the bankruptcy court based its reasoning and holding entirely on its foundational premise that the duty owed by Bayhi to Aguiluz in contribution for her failure to pay Sallie Mae her virile portion of the Loan (1) was a "debt" that (2) was "created" in the post-divorce Agreement and (3)

---

[25] In re Haber Oil Co., 12 F.3d 426, 434 (5th Cir. 1994).

[26] In re Oxford Mgmt., Inc., 4 F.3d 1329, 1333 (5th Cir. 1993).

was thus distinct from their solidary debt to Sallie Mae and — at least by implication — from their reciprocal rights as principal co-obligors to compel contribution inter se. This premise led the bankruptcy court to rule that Aguiluz's state court actions to compel Bayhi to contribute her virile portion of the Loan payments to Sallie Mae (not to repay Aguiluz for anything he may have paid on her behalf) violated § 524(a) of the Bankruptcy Code. As we shall demonstrate, the court's starting point — that Bayhi's duty of contribution owed to Aguiluz was created by the Agreement — was flawed. Like the proverbial poison tree and its fruit, therefore, this fallacy caused all rulings constructed on that foundation to be equally flawed and thus reversible error. Here's why.

Section 524(a) provides that a discharge "voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727," and "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such [discharged] debt as a personal liability of the debtor."[27] Thus, the operable question on appeal is whether Aguiluz's right to seek contribution from Bayhi by making her pay Sallie Mae her virile portion of their solidary obligation to it was a "debt discharged under section 727."[28] If it was, the bankruptcy court had the authority to rule as it did.[29] Conversely, if Aguiluz's right to require contribution from Bayhi was not discharged because her underlying solidary obligation to Sallie Mae was not

---

[27] 11 U.S.C. § 523(a) (emphasis added).

[28] Id. § 524(a)(1).

[29] In re Egleston, 448 F.3d 803, 809 (5th Cir. 2006).

discharged, the bankruptcy court exceeded its authority and committed reversible error. We hold the latter to be the case.

As noted, the bankruptcy court made two erroneous determinations in reaching its conclusion: (1) Aguiluz's and Bayhi's respective rights to compel contribution were creatures of the Agreement, not of the Loan; and (2) the obligation of each party to the other to pay Sallie Mae one-half of the Loan was separate and distinct from — not a feature of –– their solidary loan debt to Sallie Mae. We address these errors in sequence.

Source of Right to Contribution

As noted, the bankruptcy court erred in determining that Aguiluz's right to enforce contribution from Bayhi if she defaulted toward Sallie Mae arose from a new "debt" created in the Agreement. For it was not the Agreement that "created" the Loan, made it a community obligation, and produced Aguiluz's and Bayhi's correlative rights and duties as solidary co-obligors, including the right of each to compel contribution: The Agreement did nothing more than recognize pre-existing and continuing rights and duties that had arisen by operation of Louisiana law back when the parties took out the Loan during the existences of their marriage and of their community property regime.

Under Louisiana's community property law (as now conceded by Bayhi), the Loan from Sallie Mae created a community obligation ab initio, because it was incurred during the marriage for the common interests of the spouses.[30] As such, the spouses became solidary co-obligors to Sallie Mae and therefore

---

[30] La. Civ. Code Ann. art. 2360. Moreover, pursuant to art. 2361, all obligations incurred during the existence of a community property regime are presumed to be community obligations. No evidence has been offered to rebut this presumption; to the contrary, Bayhi conceded the community nature of the Loan in the state court declaratory judgment proceeding.

subject to all features of such a legal relationship under Louisiana law. Neither their divorce nor the Agreement changed that in any way. Indeed only an affirmative act of their obligee, Sallie Mae, or a formal novation by the two co-debtors, could do that.

Pre-petition, the Loan was a solidary obligation of the parties and remains so post-petition; so Sallie Mae always had, and continues to have, the right to demand the whole performance from either Aguiluz or Bayhi.[31] Again, neither their divorce nor the Agreement altered this. Another immutable feature of solidary liability for the Loan is the correlative rights and duties of the co-obligors inter se. As principal or primary solidary co-obligors — not principal and surety[32] — Aguiluz and Bayhi are each vested by Louisiana law with the right to compel contribution by the other to the extent of the other's "virile portion," which, when there are two co-obligors, is one-half of the obligation.[33] The Agreement did nothing more than acknowledge this truism, viz., the existence and nature of the Loan as a solidary community obligation that survived divorce and, absent a novation, survived any settlement of the community assets and liabilities of the former spouses, whether contractual or court-ordered. The concomitant rights and duties of each former spouse, including the right of each to enforce contribution for one-half the Loan obligation, was established automatically when they made the Loan, not subsequently when they entered the

_____

[31] La. Civ. Code Ann. art. 1790.

[32] When one solidary obligor is the principal or primary debtor and the other is merely the surety, the latter is entitled to recover all that he pays to the common obligee, not just the virile portion of the primarily liable obligor; and the process is reimbursement, not contribution. Compare La. Civ. Code Ann. arts. 1804 and 1805 (contribution) with arts. 3047-3049 (reimbursement).

[33] La. Civ. Code Ann. arts. 1790, 1804, 1805, 1829.

Agreement. To either create new rights or transmute existing ones, the Agreement would either have had to have contained express renunciations of such rights and duties (which it did not) or have been a novation (which it was not). By definition, a novation extinguishes existing obligations — here, the Loan, not the rights and duties of the obligors inter se — by substituting a new obligation for the old one; and the intent to extinguish the original obligation must be "clear and unequivocal," never presumed (as the bankruptcy court might have done here).[34]

The Agreement thus had no meaningful effect on the parties' obligations to Sallie Mae under the Loan or on the correlative rights and duties between the parties. The Agreement was in no way a novation: It neither created new obligations — extant or inchoate — nor modified or "clearly and unequivocally" extinguished old ones. The Agreement was at most an acknowledgment of the status quo and a verbalization of the mechanics for discharging the parties' existing obligation to Sallie Mae in a manner consistent with their correlative rights under the doctrine of contribution.

Indeed, if, following Bayhi's discharge, Aguiluz had merely defaulted on the Loan and Sallie Mae had made judicial demand on him alone, he would have had express legal authority under the Civil Code to join Bayhi as a third party defendant and seek contribution for her share of the Loan payments — past, present, and future —  regardless of the Agreement and regardless of

---

[34] La. Civ. Code Ann. arts. 1879, 1880; see Langhoff Props., LLC v. BP Prods. N. Am., Inc., 519 F.3d 256 (5th Cir. 2008).

16

the discharge of any debts arising from it.[35]  This further illustrates the distinction between prospective contribution as sought by Aguiluz (under which there is no requirement that one of the primary co-obligors who seeks it from another primary obligor must have first paid the creditor) and reimbursement (under which a co-obligor who is the surety, must first have paid the creditor).[36]  The cases cited by the dissent in footnotes 2 and 3 are inapposite as they address situations in which the co-obligors sought to recoup past payments, not to compel direct payment to the common creditor, as did Aguiluz.

We thus cannot credit the dissent's position that actual payment by the co-debtor is the prerequisite for any contribution claim in or out of bankruptcy.[37]  With respect, the dissent is mistaken to insist that Aguiluz's

---

[35] La. Civ. Code Ann. art. 1805.  This dichotomy appears to be overlooked by the dissent's questioning whether Aguiluz has some enhanced right to obtain prospective relief from Bayhi.  To correctly comprehend the Civil Code's doctrine of *contribution* is to recognize that, unlike *reimbursement*, a co-obligor may insist on *contribution* from the get-go:  There is nothing "prospective" about it.  Thus, when he sought only specific performance and not recovery of past payments, there was no need for Aguiluz to allege his prior payment of all or any part of Bayhi's virile portion, so there is simply no deficiency in his briefing to this court.  And, if he had needed to make that allegation at all, it would have been in state court when he sought to compel contribution.  Given the years that have elapsed since that state court litigation, we would not be surprised if Aguiluz should return to state court seeking to recoup payments made to Sallie Mae on Bayhi's virile portion.

[36] Compare La. Civ. Code Ann. art. 1805 with La. Civ. Code Ann. art. 3049.

[37] The dissent appears yet again to miss the salient distinction in the Civil Code between contribution and reimbursement, which are distinguished on the basis of the relationship between the co-obligors:  When both are principal debtors to a common creditor, the obligors are entitled to demand contribution; when, however, one co-obligor is the principal debtor and the other is a surety, the latter is entitled to demand reimbursement, which does require prior payment, while contribution does not (except when recoupment of prior payment is sought).  More importantly, the dissent does not accept the distinction that Aguiluz sought prospective contribution directly from Bayhi to Sallie Mae, not recovery in arrears of any payments he might have made on her behalf.

17

right to contribution was inchoate, and thus his assertion of it premature, if indeed he had not paid any portion of Bayhi's share of the Loan obligation or had not yet been sued by Sallie Mae on the Loan obligation.[38]

Such an argument fails for at least two reasons. First, it ignores the fact that Aguiluz expressly sought state court relief under Louisiana's Declaratory Judgment law as codified in the Louisiana Code of Civil Procedure, which provides a juridical vehicle for obtaining a determination of rights before the occurrence of a default or a lawsuit, and thus eschews any prerequisite of having made payments or suffered a money judgment to be taken. Second, Louisiana Civil Code article 1805 expressly allows a sued co-obligor to enforce contribution by impleading the recalcitrant co-obligor as a third-party defendant; and the sued co-obligor need not have paid anything to their suing common creditor before thus impleading his co-obligor. Nowhere does the Civil Code make a demand by the creditor, much less the filing of a lawsuit by the creditor, a condition precedent to compelling contribution.

(In addition, negative practical and policy effects would flow from vacating the state court judgment in this instance. If this hypothetical prematurity assertion of the dissent (never asserted by Bayhi) were enforced, co-obligors in Aguiluz's predicament would be in the Catch-22 posture of choosing either to (1) default on the non-dischargeable debt or (2) pay it off

---

[38] La. Civ. Code Ann. arts. 1804, 1805. There is no affirmative allegation by Bayhi or Aguiluz, or evidence in the record on appeal, that Aguiluz had not been paying both his and Bayhi's virile portions during the many years following her cessation of making payments; and it is inconceivable to us that Sallie Mae would not have demanded timely payment and, if none were forthcoming, would not have sued Aguiluz (and Bayhi too for that matter) at some time during the span of more than five years between Bayhi's filing for bankruptcy protection (when she ceased making her partial payments) and her reopening of the bankruptcy proceedings. But that is irrelevant here, given that Aguiluz's action in state court sought to force Bayhi to make her payments to Sallie Mae, not to repay him.

18

before seeking to recoup those payments from a co-obligor like Bayhi. The former course of action would obviously do harm to the credit rating and the business or professional reputation of co-obligors in Aguiluz's situation, and would also create additional, piecemeal litigation. The latter course of action might well present an insurmountable cash flow burden to most co-obligors. We can see no basis for preventing Aguiluz from doing via a declaratory judgment before being sued by Sallie Mae that which he is expressly authorized to do by art. 1805 after being sued by Sallie Mae, i.e., impleading Bayhi to force contribution. And, it must be remembered that contribution is a legal right and duty — not conventional — which comes into existence at the moment the solidary debt is created, always, per force, in advance of any payment (or non-payment) to the common obligee.)

"Debt" between the Parties Separate from the Loan

The bankruptcy court's second but interrelated foundational error was in concluding that Aguiluz's right to compel contribution by Bayhi was a "debt" and that it was separate and distinct from the debt that they owed in solido to Sallie Mae. Our decision in In re Fields extirpates the bankruptcy court's position on this point.[39]

In Fields, Hartford (the debtor's surety) had issued a surety bond to Fields (the debtor) covering his mixed-beverage permit issued by the State of Texas (the creditor). This bond obligated Hartford to pay all fees, taxes, and penalties levied by the Texas Alcoholic Beverages Commission to the extent Fields might fail to pay them.[40] Thereafter, Fields filed for bankruptcy and

---

[39] In re Fields, 926 F.2d 501 (5th Cir. 1991); see also Gilbert v. United States Fid. & Guar. Co., 180 F. Supp. 794 (M.D. Ga. 1959), aff'd per curiam, 274 F.2d 823 (5th Cir. 1960).

[40] Fields, 926 F.2d at 502.

subsequently failed to pay taxes covered by the surety bond.[41]   As Fields's surety, Hartford paid Texas the amount owing.[42]

In his bankruptcy case, Fields properly listed his co-obligor, Hartford, as a creditor, just as Bayhi listed her co-obligor, Aguiluz, as a creditor.[43]  Like both Aguiluz and Sallie Mae here, Hartford did not timely file a § 523(c) complaint to confirm non-dischargeability under United States Code, Title 11.[44]  When Hartford did eventually file such a complaint, Fields moved to dismiss it as untimely.[45]   The bankruptcy court denied the motion, determining that, because Hartford's claim was grounded in Fields's tax debt to Texas, which was per se non-dischargeable under 11 U.S.C. § 523(a)(1)(A), Hartford's right to reimbursement via subrogation was likewise non-dischargeable.[46]   As there is no legal distinction between a late-filed dischargeability complaint (like Hartford's) and one not filed at all (like Sallie Mae's and Aguiluz's), the clear lesson of this holding is that no § 523(c) complaint by a co-obligor (Hartford there; Aguiluz here) is required when the debt owed to the common creditor (Texas there; Sallie Mae here) is expressly non-dischargeable under a subsection of § 523(a) of the Bankruptcy Code.

On appeal, we affirmed the Fields bankruptcy court.  We agreed that, as Texas's tax claim was non-dischargeable by an express exception in the

---

[41] Id.

[42] Id.

[43] Id. at 503.

[44] Id.

[45] Id.

[46] Id.

Bankruptcy Code, Hartford, as Fields's surety, did not need to file a complaint to have non-dischargeability determined. It is in the distinction between the narrow set of statutorily non-dischargeable debts such as those particularly identified in § 523(a) on the one hand, and garden-variety tort or contractual debts that may or may not be held by the court to be dischargeable based on the degree of heinousness of the acts of the debtor in generating such debts on the other hand, wherein lies the overarching disagreement between the panel majority and the dissent in this case: Unlike the dissent, we of the panel majority conclude that per se, automatically non-dischargeable debts need not be claimed as exceptions to discharge, even though the vast majority of garden-variety debts for which a creditor seeks non-discharge must be affirmatively asserted, litigated, and ruled on by the bankruptcy court. The instant case and Fields involve statutorily non-dischargeable debts of the kind that need not be expressly asserted in the bankruptcy proceedings or ruled on by the bankruptcy court to retain their non-dischargeability.

Pursuant to § 523(a)(1)(A), we acknowledged that Fields's debt to Texas was and remained non-dischargeable. Next, we determined that state law (not the provisions of the surety bond) subrogated Hartford to the State's rights as a creditor. This allowed Hartford to pursue reimbursement from Fields to the same extent that Texas could have pursued Fields in its own right. The essence of our holding in Fields can be succinctly put: A joint and several obligor in Texas (like a solidary obligor in Louisiana) who pays or is liable for his co-obligor's statutorily non-dischargeable debt is subrogated to the rights of the creditor/subrogor as a matter of law, provided the relevant state law recognizes principles of subrogation, as do both Texas and

21

Louisiana.  As a Louisiana solidary co-obligor is legally subrogated to the rights of the creditor, he may seek contribution (if he is a co-principal) or reimbursement (if he is a surety) to the same extent as could the creditor from the otherwise discharged debtor who is not, however, discharged on that particular debt.

Such rights continue to exist even when other debts that might have been owed directly by one solidary co-obligor to the other are discharged in bankruptcy.[47]  This is because the solidary co-obligor is not seeking payment of a discharged debt owed to him, but is instead seeking to enforce his correlative rights that flow as a matter of law from his continuing relationship with the otherwise discharged party as a co-obligor on a non-discharged — and, more importantly, a per se non-dischargeable — solidary obligation to a third party.

The automatically non-dischargeable student loan here is legally indistinguishable from the automatically non-dischargeable tax obligation in Fields.  Like Fields's tax debt, Bayhi's debt to Sallie Mae was shielded from discharge vel non by § 523(a).  Thus, by seeking to enforce contribution against Bayhi after she failed to perform her non-discharged obligation to Sallie Mae, Aguiluz was asserting his law-given rights as a solidary co-obligor on the non-discharged and non-dischargeable Loan debt; he was not asserting rights of a direct pre-petition creditor of Bayhi on some discharged debt, as the bankruptcy court concluded.  Indeed, when Bayhi filed for bankruptcy protection, she was current on her virile portion of the debt to Sallie Mae; not

---

[47] Id. at 503-04; Gilbert v. United States Fid. & Guar. Co., 180 F. Supp. 794, 795-96 (M.D. Ga. 1959).

one cent of her bankruptcy estate's assets has ever been or will ever be paid to Sallie Mae or to Aguiluz.

At least for purposes of this case, there is no legal or functional difference between non-dischargeability of a pre-petition debt for state taxes pursuant to § 523(a)(1)(A) (Fields) and non-dischargeability of a pre-petition debt for a student loan pursuant to § 523(a)(8) (the instant case). Under either subsection, a creditor need never file an exception to discharge, because bankruptcy law makes these and other § 523(a) exceptions self-executing. Thus, a person like Aguiluz, who derives his state law rights from a co-debtor's statutorily non-dischargeable debt to a § 523(a)(8) creditor (here Sallie Mae), need not file an exception any more than Hartford needed to file one for its state law rights derived from the non-dischargeable tax debt to the State of Texas, a § 523(a)(1)(A) creditor.

It follows inescapably that Aguiluz's efforts to compel post-bankruptcy contribution from Bayhi in state court, and that court's rendering of the declaratory judgment and order of specific performance, were not done "with respect to any debt discharged."[48] As such, Aguiluz did not violate the bankruptcy court's discharge order and thus did not provide any basis for that court's purported (1) vacating of the state court judgment (even if we assume arguendo that it could have done so without violating the Rooker-Feldman

---

[48] 11 U.S.C. § 524(a)(1) (emphasis added). This truism shows the flaw in the dissent's statement that Aguiluz's effort to force Bayhi to pay her share to Sallie Mae is an "end run" around Bayhi's discharge. We must ask rhetorically, "how can there be an end run if there is no end to run around?" As Bayhi's debt to Sallie Mae was not discharged, there is no discharge to make an end run around by forcing Bayhi to pay her virile portion of one-half to Sallie Mae. In fact, it is Bayhi who has made the end run in this case, an end run around non-discharge, stiffing her co-obligor by simply refusing to pay her half of the Loan to Sallie Mae despite the Loan's non-discharge in Bayhi's Chapter 7 case.

doctrine), (2) enjoining future efforts by Aguiluz to enforce contribution against Bayhi, or (3) holding Aguiluz in contempt.[49]

---

[49] Although we find no mention of Bankruptcy Code § 509 by Bayhi, by the bankruptcy court, or by the district court, the dissent has invoked that section sua sponte (albeit without noting its treatment in In re Celotex Corp., 472 F.3d 1318 (11th Cir. 2006), the seminal case on point).  With respect, we are convinced that the dissent would misapply the purpose and function of § 509 and thus its applicability to the case before us today.  Indeed, the opening article in Collier addressing § 509 — Art. 509.01, Overview of Section 509 — informs that this section is "one of a series of provisions [in the Bankruptcy Code] that seeks to create or maintain a fair allocation of estate assets among many types of claimants…" (emphasis added) and concludes with the observation that § 509 "is necessary, as the legislative history points out, because the [joint and several] co-debtor's claim against the [debtor's] estate is discharged by other provisions of the Bankruptcy Code" (emphasis added).  4 COLLIER ON BANKRUPTCY ¶ 509 (15th ed. rev. 1996).  Inasmuch as the Loan owed in solido to Sallie Mae by the parties hereto was neither discharged nor dischargeable, it never constituted so much as a potential claim against Bayhi's estate assets and thus could never present a need for allocation of Bayhi's bankruptcy estate property among the various "types of claimants" with which § 509 is concerned.  Neither is the pursuit of contribution by Aguiluz a "co-debtor's claim against the estate" that was "discharged" (or dischargeable) by "other provisions of the Bankruptcy Code."  It is thus obvious to us that nothing in § 509 is relevant to a post-discharge contribution claim by a co-obligor on an undischarged and per se non-dischargeable solidary debt:  Any and all contribution compelled or recovered by Aguiluz will come from the post-bankruptcy earnings, assets, and acquisitions of Bayhi, never from any of her "estate assets."  Neither is there any potential whatsoever for the occurrence of that bugaboo of "the creditor recovering twice" as implied by the dissent.  Double recovery is possible only when a surety-like co-obligor seeks reimbursement.  See La. Civ. Code Ann. art. 1804 ("A solidary obligor…though subrogated to the right of the obligee, may claim from the other obligors no more than the virile portion of each.").  This is why the Celotex court noted at the very outset that it was not dealing with contribution.  In re Celotex Corp. is irrelevant when, as here, the co-obligor (Aguiluz) is seeking contribution post-discharge (not reimbursement during the bankruptcy proceedings) from the personal earnings or assets (not estate assets) of the already-discharged debtor/co-obligor (Bayhi) on their undischarged, non-dischargeable solidary obligation, and thus is not seeking reimbursement recoverable from "estate assets."  In this regard, the dissent either overlooks or chooses to ignore footnote 1 of the Eleventh Circuit's opinion in In re Celotex Corp.:  "We note that Fibreboard did not bring a claim for contribution but elected to bring only this [reimbursement] claim" (In re Celotex Corp., 472 F.3d at 1320) (emphasis added).  Indeed, Fibreboard, as a joint tortfeasor with Celotex (not a contractual co-debtor like Aguiluz, a distinction made clear in La. Civ. Code Ann. art. 1804) sought total reimbursement from the estate property of its bankrupt joint tortfeasor (not merely contribution, as Aguiluz seeks to compel, for his solidary co-debtor's virile portion; and then only from her post-discharge earnings and assets, not property of her bankruptcy estate).  Yet another salient difference is that Celotex was still operating in reorganization under a Chapter 11 plan, distinguishing it from Bayhi, who is

24

## III. CONCLUSION

When stripped of their rhetoric and reduced to their essentials, this admittedly verbose and redundant opinion and the succinct dissenting opinion boil down to but a single serious disagreement. That disagreement is not about the efficacy of the Rooker-Feldman doctrine (which the dissent does not address), is not about whether Aguiluz had to have paid all or part of Bayhi's virile share of the Loan to Sallie Mae before he could seek to compel contribution from her, and is not about any of the intricacies of Louisiana substantive or procedural law.[50] Rather, the core disagreement is whether (1) as the dissent insists, Aguiluz had to "appear in the bankruptcy court to assert his claim to contribution" despite its flowing from the statutorily non-dischargeable debt that Aguiluz and Bayhi owed in solido to Sallie Mae, or (2) as this opinion for the panel majority holds today, Aguiluz (like Sallie Mae) did not have to assert his prospective contribution rights in Bayhi's

_____

long since discharged (except as to the Loan) following a Chapter 7 liquidation: Collier's "fair allocation of estate assets" was very much in play in Celotex, but is a classic non-issue here. Further, the Celotex court cites with approval Cooper v. Cooper (In re Cooper), 83 B.R. 544 (Bankr. C.D. Ill. 1988) in which, as here, the divorced wife of the Chapter 7 debtor/ husband was permitted to recover in contribution from him after she paid their joint and several, non-dischargeable tax liability to the IRS as its legal subrogee. And, if all that were not enough, we note that the tort judgment debts owed jointly and severally by Celotex and Fibreboard to their asbestos victims were in no way non-dischargeable debts of Celotex, and thus were in no way comparable or analogous to the non-dischargeable contractual debt of Bayhi to Sallie Mae. In sum, we are satisfied that the ambit of § 509 cannot be stretched, as urged by the dissent, to cover the instant situation, any more than the ambit of the bankruptcy-discharge exception to the Rooker-Feldman doctrine can be stretched to immunize the state court judgments Aguiluz obtained in pursuing contribution from Bayhi to Sallie Mae under her undischarged and non-dischargeable debt.

[50] The dissent faults us for our pedantry in gratuitously penning a "primer on Louisiana law and procedure." We can only observe that, if this be so, we must be woefully inept pedagogues, as we have obviously failed to disabuse the dissent of misunderstandings and misapprehensions about those basic aspects of Civil Law that control this case.

25

bankruptcy proceedings, depending as he does and must on the statutory (11 U.S.C. § 523(a)) per se non-dischargeability of the underlying solidary obligation to Sallie Mae. We are convinced that the latter is the case for the reasons extensively set forth above, especially the distinction between obligations that are statutorily exempt from discharge, such as those listed in § 523(a), and run-of-the-mill debts the non-discharge of which must be filed for and granted or denied by the court.

Based on the applicable law of Louisiana, the Bankruptcy Code, the applicable case law, and our extensive review of the parties' briefs and the record on appeal, we hold that the bankruptcy court exceeded the authority granted to it by § 524(a)(1) (and also violated the Rooker-Feldman doctrine in the process) when it purported to vacate the relevant state court judgments and to enjoin the commencement of any future "collection" attempts by Aguiluz. It follows that the court abused its discretion as well when it held Aguiluz in contempt. Accordingly, we reverse the judgments of the bankruptcy court and district court, and we remand this action to the bankruptcy court with instructions for it to lift its vacatur of the state court's judgments and to vacate its contempt order and its injunction of future efforts by Aguiluz to enforce his right of contribution as Bayhi's solidary co-obligor on the non-dischargeable and undischarged debt to Sallie Mae.
REVERSED AND REMANDED WITH INSTRUCTIONS.

EDITH H. JONES, Chief Judge, Concurring in Part and Dissenting in Part:

I concur in the vacatur of the contempt judgment against Aguiluz, because I believe that he pursued his action in Louisiana state court in an attempt to do no more than compel Bayhi not to pay him but to pay Sallie Mae her undischarged share of the couple's student loan debt. In asserting that novel claim, Aguiluz did not intentionally violate his ex-wife's discharge order and should not be subject to civil contempt for violation of the 11 U.S.C. § 524(a) discharge injunction.

I dissent, however, from the holding that the state court judgment must be reinstated. It is an end run around Bayhi's discharge for Aguiluz to seek to compel her to pay Sallie Mae. The only consequence of the state court judgment is to relieve Aguiluz of the threat he would otherwise face that Sallie Mae will come after him (rather than Bayhi) because of his co-liability on the debt. The action effected a de facto partition of the Sallie Mae liability from his standpoint. Had Aguiluz sought this relief from his ex-wife during her bankruptcy, it would have been a "claim" that might well have been discharged. I say "might" because this is a novel situation.

What is not novel here is that Aguiluz was required to appear in the bankruptcy court to assert his claim. The term "claim" is defined as broadly as possible by the Bankruptcy Code, to effectuate the broadest possible relief for the debtor. See Matter of Southmark Corp., 88 F.3d 311, 316-17 (5th Cir. 1996); 11 U.S.C. § 101(5).[1] Moreover, the Bankruptcy Code explicitly deals

_____

[1] 11 U.S.C. § 101(5) states:

> (5)　　The term "claim" means —
>
> 　　(A)　right to payment, whether or not such right is reduced to

27

with claims for contribution among co-debtors.  See 11 U.S.C. § 502(a).  Whether it ultimately proved to be contingent or matured, allowed, disallowed, or nondischargeable, however, Aguiluz had a "claim" against his wife's bankruptcy estate, and he was required to pursue that claim in bankruptcy court.  Because he did not pursue it, the claim is barred.

The majority reason that because the underlying debt is for a nondischargeable student loan, Aguiluz could ignore the bankruptcy case, refuse to file a proof of claim, and seek his independent post-bankruptcy declaratory judgment in state court.  He could thus assume the status of the student loan agency – Sallie Mae – both as to nondischargeability of <u>his</u> contribution claim and as to the fact that Sallie Mae need not file a proof of claim.  11 U.S.C. § 523(a)(8).

The first proposition is dubious on this record; the second is wrong.

First, the record is curiously silent as to whether, and how much, Aguiluz may have paid on his ex-wife's share of the Sallie Mae debt.  The majority assumes he has been paying her share, see footnote 30, but there is no substantiation in the record or in Aguiluz's pleadings and briefs for their speculation.  Yet actual payment by the co-debtor is the prerequisite for any contribution claim in or out of bankruptcy.[2]  Aguiluz's claim cannot

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B)  right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

[2]For all its insistence that "Louisiana-brand" contribution is owed ab initio, the majority cite no authority that supports this proposition.  This is because the authority indicates quite the reverse:  payment of a co-debtor's share is a pre-requisite for contribution in Louisiana.  See, e.g., Cole v. Celotex Corp., 599 So. 2d 1058, 1072 (La. 1992)

28

functionally assume Sallie Mae's status if he has made no payments on Bayhi's behalf.[3]

Second, there is no support for the majority's conclusion that Aguiluz could bypass bankruptcy court in making his contribution claim against Bayhi. In In re Fields, 926 F.2d 501 (5th Cir. 1991), this court ruled on a nondischargeability contest arising between the debtor and a surety who had fully paid the debtor's state liquor taxes. The surety was indeed subrogated to the nondischargeability of the state tax, but it filed a complaint <u>in bankruptcy court</u> to assure its status. All of the cases Fields cites followed the same procedure. See id. at 504, n.8.

Bankruptcy courts have jurisdiction to determine all "claims" against the debtor. They must decide the status of contribution claims in order to prevent double recovery against a debtor's estate and because such claims, like any others, may be subject to defenses or limitations assertable by the

---

("The cause of action for contribution will not accrue or mature, however, until payment of an excess of the virile portion."); Scott v. Behrman, 273 So. 2d 661, 665 (La. Ct. App. 1973) (no contribution where claimants had not paid 'the whole debt,' nor more than their share) (citing predecessor to La. Civ. Code. Ann. art. 1804); see also La. Civ. Code Ann. art. 1804 ("A solidary obligor who has rendered the whole performance . . .may claim from the other other obligors no more than the virile portion of each.") (emphasis added).

The Fifth Circuit has already recognized this as the law in Louisiana: "[Plaintiffs] may claim contribution from [Defendants] only if their payment . . . may in some way discharge part of [Defendant's] potential liability." Diggs v. Hood, 772 F. 2d 190, 194 (5th Cir. 1985) (citing La. Civ. Code Ann. art. 1804); see also id. at 197 ("The right to contribution exists only in favor of a party who has paid what someone else owes.")

[3]The majority's attempt to skirt this basic requirement by characterizing this as a matter of "legal subrogation" is likewise unavailing. Legal subrogation in Louisiana requires an actual payment of the co-obligor's debt: "Legal subrogation occurs when the settlement pays the obligee's entire debt—not just the paying obligor's portion—and when the paying obligor brings an action against the others as a result of payment." Dumas v. Angus Chemical Co., 742 So.2d 655, 667 (La. Ct. App. 1999) (emphasis added). "Subrogation takes place by operation of law in favor of an obligor who pays a debt he owes with others or for others and who has a recourse against those others as a result of the payment." La. Civ. Code Ann. art 1829(3).

debtor. Aguiluz appeared in the bankruptcy case, but he filed neither a proof of claim nor a complaint to determine the nondischargeability of his contribution claim against Bayhi. Had the claim been simply contingent at the time, it might well have been subject to disallowance, because the Code discharges a debtor from such obligations. 11 U.S.C. § 502(e)(1)(B).[4] Whether, in this case, some consequence of Louisiana law or the nondischargeability of the underlying debt would alter the substantive outcome are novel questions. But these questions go to the nature of a contribution claim between the debtor and a co-debtor. They existed at the date of bankruptcy; they are within the bankruptcy court's jurisdiction; and they could and should have been litigated there initially. Because Aguiluz neither asserted his claim nor received a declaration of its nondischargeability, he forfeited it. Aguiluz's later state court action interfered with Bayhi's discharge, and its judgment should be vacated.

The majority would wipe out bankruptcy court jurisdiction on the theory that Aguiluz holds a special position as the co-debtor on a nondischargeable debt. My point is that no matter what position Sallie Mae holds by statute vis-á-vis the bankruptcy, a contribution claim runs only between co-debtors. In subrogation, by contrast, the co-debtor steps formally into the shoes, and accedes to the rights and remedies, of the creditor. The majority disavows reliance on subrogation (or "reimbursement") in favor of calling this a contribution claim. But treating it as such, nothing in the comprehensive scope of bankruptcy jurisdiction authorizes Aguiluz to refrain from asserting his claim for contribution against Bayhi in bankruptcy court.

---

[4]The majority apparently agree that if the state court judgment were founded, as the bankruptcy court believed, on the divorcing spouses' agreement, it would have been a dischargeable claim in bankruptcy.

30

Unfortunately, the majority err not only in analyzing the "contribution" claim but even more fundamentally, in understanding what claim Aguiluz makes. He nowhere purports to litigate a contribution claim. Instead, when Aguiluz describes his right, he calls it a right of "subrogation." I assume he means what he says, and his actual claim dooms the majority's approach. In bankruptcy, a creditor who is a co-debtor may assert a claim for contribution or subrogation, but not both. 11 U.S.C. § 509(b)(1). As a subrogation claim, Aguiluz's assertion would fail under bankruptcy law and many states' law because he "received consideration for the claim held by the creditor." 11 U.S.C. § 509(b)(2). As the majority concede, Aguiluz benefitted from the community student loan. Moreover, a subrogation claim would not have been allowed unless Aguiluz fully paid the Sallie Mae debt. In re Fields is thus substantively (as well as procedurally) distinguishable because the surety there had paid the full liquor tax and had clearly received no prior benefit from the creditor.[5]

The majority's analysis and result, in short, condone a clever avoidance of the broad scope of bankruptcy court jurisdiction and amount to a complete re-lawyering of the case in favor of Aguiluz. Aguiluz had a chance to seek a remedy in bankruptcy court; Bayhi has had no chance to respond to the

---

[5]The majority respond at length to my invocation of the Bankruptcy Code provision limiting subrogation claims. 11 U.S.C. § 509(b) and (b)(2). I raised this provision because Aguiluz describes his claim as one for subrogation — and only subrogation. Further, I note that the majority's citation of a case in which an ex-wife recovered, as a subrogee of the IRS, against her ex-husband, the debtor, was a dispute litigated in bankruptcy court. See Cooper v. Cooper (In re Cooper), 83 B.R. 544 (Bankr. C.D. Ill. 1988). This proves my point: Bankruptcy court is the proper forum even for the litigation of allegedly nondischargeable claims for subrogation or contribution.

31

majority's views.[6]  The majority worries about Aguiluz's financial condition, but we have no basis to assess the ultimate equities without any evidence that Aguiluz has had to pay any of his wife's share of the student loan debt.

The better result in this case would be to vacate the state court judgment, dismiss the contempt citation, and pretermit the majority's gratuitous and hitherto unlitigated primer on Louisiana law and procedure.

I respectfully dissent.

---

[6]Bayhi's inability to respond is particularly troubling in light of the majority's muddled (to say the least) depiction of Louisiana law.  See supra.