# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-40538

United States Court of Appeals
Fifth Circuit

**FILED**

May 27, 2016

Lyle W. Cayce
Clerk

In the Matter of: ABDUL KARIM PIRANI

Debtor

_____

ABDUL KARIM PIRANI,

Appellant

v.

MALIK BAHARIA; ABDUL HAMID GILANI; NADIRSHAH LALANI; HMN PARTNERS, L.L.C.,

Appellees

_____

Appeal from the United States District Court
for the Eastern District of Texas

_____

Before HIGGINBOTHAM, SOUTHWICK, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This is an appeal from a district court's order affirming a bankruptcy court judgment rendered after trial in an adversary action. The adversary action comprises the claims, counterclaims, and affirmative defenses between two sides of a business scheme to buy, renovate, and operate a Days Inn in Sherman, Texas. Abdul Karim Pirani—appellant here—and his brother, Nasim Aziz, formed the plan to buy the hotel. Appellees are the investors that

No. 15-40538

the brothers convinced to buy a fifty-percent stake in the scheme—Malik Baharia, Abdul Hamid Gilani, and Nadirshah Lalani—and the company that the three investors formed to hold their membership interest.

I.

In 2008, two brothers, Pirani and Aziz, decided to buy and renovate a Days Inn in Sherman, Texas. They formed a purchasing entity for the hotel, Circle Sherman, LLC, and looked for investors. Eventually, they recruited three individuals—Baharia, Gilani, and Lalani—who agreed to buy a fifty-percent stake in Circle Sherman. The three investors formed HNM Partners, LLC, to hold their membership interest.

In February 2009, the brothers and the investors borrowed close to $2.5 million for the project. To receive the loan, both brothers and all three investors signed three documents in favor of their lender, One World Bank: (1) a note, which set out the terms of the loan; (2) a deed of trust, which secured the loan with a lien on the hotel; and (3) a guaranty agreement, in which they agreed to guarantee, "jointly and severally," full payment of the loan in the event of a default on the note. The two brothers signed the guaranty agreement in their individual capacities. The three investors signed for their company, HNM, and also in their individual capacities.

Almost immediately after obtaining the loan, the two sides fell out over the planned renovations of the hotel. By April, HNM had sued the brothers in state court. By August, the parties had settled, having agreed that Circle Sherman would buy back HNM's fifty-percent stake in the company, with the brothers promising to personally guarantee the purchase price.

The settlement agreement also contains a promise that Gilani, Baharia, and Lalani would be released from their personal guaranties under the guaranty agreement with One World Bank. Specifically, section 3.2 of the settlement agreement provides:

2

> In the event that the Company obtains a third party investor for the purpose of purchasing HNM's Membership Interest, the Company shall in good faith make best efforts to have the Bank release Gilani, Baharia and Lalani from their personal guaranties of the Loan. If the Company is unable to obtain a release from the Bank of the guaranties, Gilani, Baharia and Lalani agree to continue to be guarantors of the Loan until July 9, 2012 at which time they shall be released either through the Company's refinancing of the Loan or sale of the Hotel.

"Company" is defined four different ways in the agreement. First, the opening paragraph of the settlement agreement defines the parties as follows: "Baharia . . . Gilani . . . [and] Lalani . . . for themselves individually and on behalf of HNM Partners, LLC (collectively 'HNM') on the one hand" and "Aziz . . . [and] Pirani, for themselves and on behalf of Circle Sherman, LLC (collectively the 'Company') on the other." Second, section 3.1(a) of the agreement provides: "Nasim Aziz, Abdul Karim Pirani and HNM Partners LLC are the sole members of Circle Sherman LLC ('the Company')." Finally, sections 4.1 and 4.2, which govern the parties' respective litigation releases, provide two more definitions.

Shortly thereafter, Circle Sherman defaulted on the note. One World Bank demanded payment from each of the guarantors and eventually sued all of the guarantors in Texas state court. Thereafter, it foreclosed on the hotel, which sold for $2,350,000, leaving a deficiency of $828,190.13. The brothers and the investors raised a no-deficiency affirmative defense to One World Bank's demand for payment, arguing that the hotel was worth significantly more than it sold for at foreclosure.

Within the bank litigation, Baharia, Gilani, Lalani, and HNM filed three breach-of-contract crossclaims against Circle Sherman and the brothers. First, they claimed that Circle Sherman and the brothers had breached their settlement agreement by failing to buy back HNM's membership interest (the

"payment claim"). Second, they claimed that Circle Sherman and the brothers had breached the settlement agreement by failing to secure the release of Baharia, Gilani, and Lalani from the guaranty agreement (the "release claim"). Finally, they claimed that Circle Sherman and the brothers had breached the settlement agreement by defaulting on the note. The state court granted summary judgment in favor of HNM on the payment claim.

The state court set a date for trial on the brothers' and investors' common no-deficiency defense against One World Bank's demand for payment. On the (literal) eve of trial, One World Bank, Pirani, and Aziz notified the court that they had "settled" with each other, and the next day they did not appear in court. Only the three members of HNM showed up for trial.

Under One World Bank's settlement agreement with Pirani and Aziz, One World Bank assigned the note, the guaranty agreement, and all of the bank's claims against HNM to a third-party entity—owned by Pirani—that later transferred the note, guaranty agreement, and claims to Pirani. In exchange, Pirani—through the third-party—paid One World Bank $300,000.

After One World Bank and the brothers notified the court of their settlement and failed to appear at trial, the court dismissed, without prejudice, the bank's claim against HNM and the three investors. It then severed HNM's payment crossclaim against the brothers, on which it had already granted summary judgment in favor of HNM, into a separate suit, and dismissed, without prejudice, Baharia, Gilani, Lalani, and HNM's remaining crossclaims against Circle Sherman and the brothers, on the ground that the remaining crossclaims were "derivative of and subject to the [bank]'s claim" against HNM. In the severed case containing only the payment claim, the court issued an agreed final judgment in favor of Baharia, Gilani, Lalani, and HNM for $616,181.16: the amount that Circle Sherman had promised to pay to buy back HNM's fifty-percent membership interest, plus interest.

No. 15-40538

In July 2012, Pirani filed for bankruptcy. In the bankruptcy proceeding, HNM filed a proof of claim against Pirani's bankruptcy estate based on the state-court agreed final judgment on the payment claim. Pirani then initiated this adversary proceeding, bringing a claim against HNM and Baharia, Gilani, and Lalani for breach of the guaranty agreement that had been assigned to him by the bank. He sought to recover $828,190.13—the full amount of the alleged deficiency on the note. As an affirmative defense against Pirani's guaranty claim, HNM and the three investors asserted that no deficiency existed with respect to the note, because the hotel's fair market value at the time of foreclosure exceeded the foreclosure sale price by more than the alleged deficiency. They also counterclaimed for breach of the settlement agreement and breach of fiduciary duty. Pirani argued that the counterclaims were barred by res judicata.

After a trial in the adversary proceeding, the bankruptcy court issued findings of fact and conclusions of law, in which it held that Baharia, Gilani, Lalani, and HNM's counterclaim for breach of the settlement agreement was not barred by res judicata; that Pirani was bound by and had breached the settlement agreement; that Pirani's claim for breach of the guaranty agreement was barred by his breach of the settlement agreement; and that the HNM parties were entitled to attorney's fees and costs on the basis of their successful claim for breach of the settlement agreement. The district court affirmed the bankruptcy court judgment, and this appeal followed.

## II.

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *See In re Bayhi*, 528 F.3d 393, 402 (5th Cir. 2008). When, as here, a district court has affirmed the bankruptcy court's factual findings, we will reverse only if we are left with the definite and firm conviction that an error has been made. *See id.*

No. 15-40538

III.

A.

Pirani first challenges the district court's affirmance of the bankruptcy court's holding that res judicata did not bar Baharia, Gilani, and Lalani's breach-of-contract counterclaim. Baharia, Gilani, and Lalani contend that Pirani promised in the settlement agreement to secure their release from their personal guaranties under the guaranty agreement, and that he breached the agreement by failing to do so. Pirani argues that the counterclaim is based on the same contract—the settlement agreement—that formed the basis of Baharia, Gilani, Lalani, and HNM's claim for payment that went to final judgment in the severed state-court action. As a result, he contends, Baharia, Gilani, and Lalani, should not be able to bring a claim that they could have brought in the earlier state-court action.

To determine the preclusive effect of an earlier state-court judgment, federal courts apply the preclusion law of the state that rendered the judgment. *See Weaver v. Tex. Capital Bank N.A.*, 660 F.3d 900, 906 (5th Cir. 2011). The agreed final judgment at issue here was issued by a Texas state court. Thus, Texas preclusion law applies.

In Texas, claim preclusion, or res judicata, bars a party from bringing a claim in a later case when: "(1) there is a prior final judgment on the merits . . . ; (2) the parties in the second action are the same or in privity with those in the first action; and (3) the second action is based on the same claims as were raised or could have been raised in the first action." *Id.* (citing *Igal v. Brightstar Info. Tech. Grp., Inc.*, 250 S.W.3d 78, 86 (Tex. 2008)). The Texas Supreme Court follows the transactional approach to res judicata. *See Barr v. Resolution Tr. Corp.*, 837 S.W.2d 627, 631 (Tex. 1992). Under the transactional approach, res judicata precludes relitigation of claims that arise out of the same subject matter as an earlier suit and that, "through the exercise of

diligence," could have been litigated in the earlier suit between the parties. *Id.* When "there is a legal relationship, such as [ ] a lease or contract, all claims arising from that relationship will arise from the same subject matter and be subject to res judicata." *Weaver*, 660 F.3d at 907 (quoting *Sanders v. Blockbuster, Inc.*, 127 S.W.3d 382, 386 (Tex. Ct. App. 2004)); *see also id.* at 907 & n.8 (collecting cases). Thus, res judicata will preclude litigation of claims arising out of a contract that were or could have been litigated in an earlier action concerning that same contract.

Nonetheless, a "logical corollary" to the rule that res judicata bars claims that "could have been litigated in an earlier action," is that res judicata "cannot preclude litigation of claims that a trial court explicitly separates or severs from that action." *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985). For example, in *Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 205 (Tex. 1999), Valero sued two defendants, Ingersoll and Kellogg, for malfunctioning equipment. Kellogg defended on the basis of an indemnification agreement, and the district court granted partial summary judgment for Kellogg on the basis of the agreement. *Id.* After Kellogg won summary judgment on indemnification—and nearly five years after Valero initiated the lawsuit—Kellogg filed a claim for attorney's fees, also under the indemnification agreement. *Id.* at 206. Thereafter, the trial court severed the payment claim from the other claims in the case so that Valero could appeal the decision. *Id.* at 205. The court of appeals affirmed, and the summary judgment became final. *Id.* Valero then moved for summary judgment on the attorney's fees issue in the original action, arguing that the claim for fees was barred by res judicata. *Id.* The Texas Supreme Court held that the claims were not barred: "Kellogg filed its claim one month before severance in the original action while summary judgment was still interlocutory. As such, the claim was

properly preserved through the severance order for later adjudication, and *res judicata* does not bar it." *Id.* at 211.

Here, in the state-court action brought by the bank, Baharia, Gilani, Lalani, and HNM filed the release claim as a crossclaim against Pirani. The state court granted partial summary judgment in favor of Baharia, Gilani, Lalani, and HNM on another of their crossclaims, the payment claim. Then, like the trial court in *Ingersoll-Rand*, the trial court severed the payment claim on which it had already granted summary judgment. Thus, as in *Ingersoll-Rand*, the release claim was filed "in the original action while summary judgment was still interlocutory." *Id.* This means that "the claim was properly preserved through the severance order for later adjudication, and res judicata does not bar it." *Id.* Hence Pirani's res judicata argument fails.

## B.

Pirani next challenges the district court's affirmance of the bankruptcy court's judgment that Pirani breached his settlement agreement with Baharia, Gilani, and Lalani. The bankruptcy court held that Pirani had agreed in the settlement agreement to secure the release of the three investors from their personal guaranties of the note, and that he had breached the settlement agreement by failing to do so. Pirani responds in two ways.

## 1.

Pirani first argues that he was not personally bound by the promise to release Baharia, Gilani, and Lalani from their personal guaranties. Under Texas law, a party breaches a contract by failing or refusing to do something he has promised to do. *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. Ct. App. 2006). Here, Pirani contends that he never personally promised to secure the release of Gilani, Baharia, and Lalani from their personal guaranties. Instead, he contends that section 3.2 of the settlement agreement, the section promising the releases, bound only Circle Sherman. That section provides:

No. 15-40538

> In the event that the Company obtains a third party investor for the purpose of purchasing HNM's Membership Interest, the Company shall in good faith make best efforts to have the Bank release Gilani, Baharia and Lalani from their personal guaranties of the Loan. If the Company is unable to obtain a release from the Bank of the guaranties, Gilani, Baharia and Lalani agree to continue to be guarantors of the Loan until July 9, 2012 at which time they shall be released either through the Company's refinancing of the Loan or sale of the Hotel.

Pirani points out that only "the Company" is directly named in the section; neither he nor Aziz are mentioned by name. Thus, he reasons, only "the Company"—which he contends refers to only Circle Sherman—promised to secure the releases. In contrast, Baharia, Gilani, and Lalani contend—and both the bankruptcy court and district court held—that Pirani is included in the meaning of the phrase "the Company" in section 3.2 of the settlement agreement, and thus is bound by the promise to secure the releases.[1] The question presented, therefore, is whether Pirani is part of "the Company" for the purposes of section 3.2.

i.

The settlement agreement provides that it is to be interpreted according to Texas law. When construing a written contract under Texas law, a court must "ascertain the true intentions of the parties as expressed in the writing

---

[1] As a preliminary matter, Baharia, Gilani, and Lalani contend, consistent with the district court's analysis, that Pirani is estopped from arguing for his proposed definition of "the Company" because he stipulated in the parties' joint pretrial order that "[t]he Settlement Agreement defines . . . all of [Pirani], Aziz and Circle Sherman as 'the Company.'" "It is a well-settled rule[] that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000) (quoting *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996)). The pretrial order controls the scope and course of the trial, Fed. R. Civ. P. 16, and a party waives an issue not included the order, *Kona Tech.*, 225 F.3d at 604. Although Pirani's stipulation in the pretrial order as to the definition of "the Company" further reinforces our analysis, we do not rely on it to the extent that the stipulation addresses a question of law. *See In re El Paso Refinery, L P*, 171 F.3d 249, 257 (5th Cir. 1999) (noting that the proper interpretation of a contract is a question of law).

itself." *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)). To achieve this goal, courts should "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011) (quoting *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006)). The court can also consider "the facts and circumstances surrounding a contract, including 'the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction.'" *Kachina Pipeline*, 471 S.W.3d at 450 (quoting *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014)). "No single provision taken alone will be given controlling effect[.]" *Id.* (quoting *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). Absent ambiguity, the writing alone is deemed to express the intention of the parties. *See In re El Paso Refinery, L P*, 171 F.3d 249, 257 (5th Cir. 1999) (applying Texas law).

Whether a contract is ambiguous is a question of law for the court. *See Progressive Cty. Mut. Ins. Co. v. Kelley*, 284 S.W.3d 805, 808 (Tex. 2009). If the contract can be given a "certain or definite legal meaning or interpretation, then it is not ambiguous." *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996). Nor is a contract ambiguous "merely because the parties disagree on its meaning." *Seagull Energy*, 207 S.W.3d at 345. Rather, ambiguity exists only if the contract's "meaning is uncertain," *Lenape*, 925 S.W.2d at 574, or if the language is "susceptible to two or more reasonable interpretations," *Seagull Energy*, 207 S.W.3d at 345.

When contractual provisions arguably conflict, Texas courts employ canons of construction as tools to harmonize them. *See G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 532 (Tex. 2015). Those canons

include the rules that (1) specific provisions control over general provisions, *see Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994); (2) provisions stated earlier in an agreement are favored over subsequent provisions, *see Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); and (3) the interpretation of an agreement should not render any material terms meaningless, *see Kachina Pipeline*, 471 S.W.3d at 450.

ii.

The issue is whether Pirani is personally bound by promises made by "the Company" in section 3.2. "When contracting parties set forth their own definitions of the terms they employ, the courts are not at liberty to disregard these definitions and substitute other meanings." *Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex. Ct. App. 2005). Here, the parties chose and set forth a definition of the term "the Company" in the opening paragraph of their agreement. That paragraph defines the parties as "Baharia . . . Gilani . . . [and] Lalani . . . for themselves individually and on behalf of HNM Partners, LLC (collectively 'HNM') on the one hand" and "Aziz . . . [and] Pirani, for themselves and on behalf of Circle Sherman, LLC (*collectively the 'Company'*) on the other." Per this definition, "the Company" includes Pirani.

Pirani argues that this definition should not apply to section 3.2, relying on a second mention of "the Company" that appears in subsection 3.1(a).[2] Subsection 3.1(a) provides that "Nasim Aziz, Abdul Karim Pirani and HNM Partners LLC are the sole members of Circle Sherman LLC ('the Company')." Working with this definition, Pirani contends that the "the Company" in subsection 3.1(a) refers to only Circle Sherman, the entity listed last in the

---

[2] Sections 4.1 and 4.2, which govern the parties' respective litigation releases, provide two more definitions of "the Company," but those sections are not relevant to the analysis here.

sentence, rather than to all of the parties listed (which would include him).[3] From there, he argues that his proposed "Circle Sherman" definition of "the Company" should be read to apply to all of article 3—that is, to sections 3.1 through 3.5[4]—and thus, to section 3.2. He contends that this approach is supported by the canon of construction that "a specific contractual provision controls over [a] general provision concerning the same issue," *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). Thus, he reasons, the court should read the definition of "the Company" provided in the opening paragraph as a "general rule" and the definition provided by subsection 3.1(a) as an "exception" applicable to all of article 3. *See NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. Ct. App. 2013) ("[P]arties may choose to set out a general rule in one provision and exceptions to that rule in other provisions.").

In response, HNM argues that subsection 3.1(a)'s definition of "the Company" applies only within section 3.1. We agree. The full text of section 3.1 provides:

> 3.1 Until the Purchase Price (including any interest and sales profit) is paid in full to HNM, HNM shall retain its Membership Interest in the Company. Notwithstanding the foregoing, HNM shall not be liable for any losses incurred by the Company nor be entitled to any profits of the company and shall not be subject to any capital calls by the Company. *The Parties agree that the following provisions of the order of the Court signed*

---

[3] The district court rejected this contention. We share the district court's skepticism as to Pirani's reading of subsection 3.1(a), but ultimately reject Pirani's argument for a different reason and thus need not decide the issue. *See Healthcare Cable*, 180 S.W.3d at 792 (concluding that a parenthetically defined term was ambiguous because the court was "aware of no rule of construction, grammar, or punctuation that [would] permit [it] to determine precisely to what portion of the preceding sentence or other portion of a document [the] parenthetically-defined term refers").

[4] The section that should be labeled "3.5"—the one after section 3.4—is labeled "3.2" in the agreement. This appears to be a clerical error.

*on or about May 1, 2009 in the Litigation shall govern the relationship of the Company's Members:*

> a. Nasim Aziz, Abdul Karim Pirani, and HNM Partners LLC are the sole members of Circle Sherman LLC ("the Company");

> b. The Company is a member-managed Company, and each of the foregoing members has an equal vote in the management of the business and affairs of the Company, and the affirmative vote of a majority of the members of the Company constitutes an act of the governing authority and is valid and binding on the Company;

> c. Nasim Aziz has had the sole and exclusive authority to manage both the renovation and operations of the Hotel since December 2008. That authority shall continue as a result of this Agreement, and the Parties hereby ratify the prior resolutions of the Company in this respect;

> d. HNM Partners, LLC or its representatives shall not take any action to impede Nasim Aziz in the proper carrying out of his authority to manage both the renovation and operations of the Hotel.

The italicized text states in clear terms the scope and function of the provisions that follow: those provisions (that is, subsections 3.1(a)–(d)) set out principles governing the relationship between the members of Circle Sherman with respect to the management and government of Circle Sherman until HNM receives the purchase price for its membership interest. A straightforward reading of section 3.1 provides no reason to apply those provisions outside of section 3.1. *Cf.* Antonin Scalia and Bryan A. Garner, Reading Law 156 (2012) (explaining scope-of-subparts canon, according to which material within an indented subpart relates only to that subpart). Thus, subsection 3.1(a)'s definition does not apply to section 3.2. Hence we apply the overall definition from the opening paragraph, which includes Pirani. *See Healthcare Cable*, 180 S.W.3d at 791; *see also Coker*, 650 S.W.2d at 393 (restating rule that provisions stated earlier in an agreement are favored over subsequent provisions). Pirani is bound by the promise to secure the releases.

The overall context of the agreement also supports this result. Under Texas law, courts are expressly permitted to take into account the "objectively determinable" "facts and circumstances surrounding [the] contract" that "give context to the parties' transaction." *Kachina Pipeline*, 471 S.W.3d at 450 (citation omitted). Here, the most critical relevant circumstance is that the contract is a settlement agreement, drafted and entered into for the purpose of settling claims between two sides to a dispute. Those two sides are defined in the opening paragraph, with "the Company" encompassing all parties on the brothers' side of the dispute. In the context of a settlement agreement, section 3.2 makes the most sense if the promise to secure releases for Gilani, Baharia, and Lalani is binding all of the parties on the other side of the dispute.

Pirani responds that his preferred definition of "the Company" must nonetheless apply to all of article 3 because the term "the Company" makes more sense elsewhere in article 3 if it is read to mean only Circle Sherman and not also Aziz and Pirani. For example, in section 3.3, the agreement addresses "HNM's membership interest in the Company." HNM does not have a "membership interest" in Aziz or Pirani. The problem with this argument is that other articles of the contract contain similar examples. In article 2, for instance, subsection 2.1(c) sets forth obligations that will be triggered "[i]n the event that the Company defaults on any of its debt obligations," and subsection 2.1(d) discusses the payment of "all valid liabilities of the Company." It does not make sense for the settlement agreement to include provisions relating to Aziz or Pirani's personal "debt obligations" or "valid liabilities." Hence the phrase "the Company" in these provisions would read more logically if taken to mean only Circle Sherman. And yet these subsections are found in article 2, which no one argues should be governed by the definition of "the Company" found in subsection 3.1(a).

No. 15-40538

As stated above, we are "not at liberty to disregard [the] definitions" set forth by the parties. *Healthcare Cable*, 180 S.W.3d at 791. Here, the parties chose and set forth a definition of the term "the Company" in the opening paragraph of their agreement. That the parties drafted later provisions of the contract with inattention to the definition they chose does not give us license to rewrite section 3.2 by applying subsection 3.1(a) beyond its specified purpose and scope. "The Company" in section 3.2 includes Pirani.

2.

Second, Pirani argues that, even if he is personally bound by section 3.2's promise to release, that promise was subject to unfulfilled conditions precedent. Again, section 3.2 provides:

> In the event that the Company obtains a third party investor for the purpose of purchasing HNM's Membership Interest, the Company shall in good faith make best efforts to have the Bank release Gilani, Baharia and Lalani from their personal guaranties of the Loan. *If the Company is unable to obtain a release from the Bank of the guaranties, Gilani, Baharia and Lalani agree to continue to be guarantors of the Loan until July 9, 2012 at which time they shall be released either through the Company's refinancing of the Loan or sale of the Hotel.*

The bankruptcy court relied on the second sentence, italicized above, to hold that

> Pirani agreed . . . to release the defendants no later than July 9, 2012, through the sale of the Hotel or the refinancing of Circle Sherman's indebtedness to [One World Bank ("OWB")]. Pirani did not have the ability to release the defendants at the time of the Settlement Agreement, but he obtained that ability when he acquired the Note and guarantees from OWB in March 2012. He failed to do so. Instead, he has pursued the defendants, embroiling them in years of litigation and the attendant expenses, for what he claims they should have paid to OWB under the guaranty agreement.

15

Pirani argues that this holding was error, because the last portion of section 3.2's second sentence, which specifies *how* the investors will be released ("either through the Company's refinancing of the Loan or sale of the Hotel") establishes conditions precedent to the promise. He asserts that both "refinancing" or "sale" of the hotel were "physically impossible" as of August 2011, when One World Bank foreclosed on the hotel. Thus, he reasons, the conditions could not be fulfilled, and the promise was never triggered. Pirani briefed this issue below, but the district court did not directly address it.

In response, HNM argues that the second sentence constitutes an unconditional promise that the individual members of HNM "would be released no later than July 9, 2012." HNM contends that the language about "refinancing" or "sale" of the hotel should be read not as a condition but as an additional covenant.

Under Texas law, "[c]onditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty." *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976). "Because of their harshness in operation, conditions are not favorites of the law." *Id.* (quoting *Sirtex Oil Indust., Inc. v. Erigan*, 403 S.W.2d 784 (Tex. 1966)). When "the intent of the parties is doubtful or where a condition would impose an absured [*sic*] or impossible result[,] then the agreement will be interpreted as creating a covenant rather than a condition." *Id.* Similarly, "[s]ince forfeitures are not favored, courts are inclined to construe the provisions in a contract as covenants rather than as conditions. If the terms of a contract are fairly susceptible of an interpretation which will prevent a forfeiture, they will be so construed." *Id.* (quoting *Henshaw v. Texas Nat. Res. Found.*, 147 Tex. 436, 444, 216 S.W.2d 566, 570 (1949)).

16

No. 15-40538

Texas courts look for particular language when evaluating whether a term constitutes a condition precedent. *See Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). In particular, "a term such as 'if,' 'provided that,' 'on condition that,' or some similar phrase of conditional language must normally be included. If no such language is used, the terms will be construed as a covenant in order to prevent a forfeiture." *Id.* This is not because there is a strict "requirement that such phrases be utilized," but because "their absence is probative of the parties intention that a promise be made, rather than a condition imposed." *Id.*

Here, the contested language reads: "If the Company is unable to obtain a release from the Bank of the guaranties, Gilani, Baharia and Lalani *agree* to continue to be guarantors of the Loan *until* July 9, 2012 at which time they *shall be released* either through the Company's refinancing of the Loan or sale of the Hotel." The language that we have italicized indicates that the parties drafted this sentence as a mandatory provision; Gilani, Baharia, and Lalani agreed to remain guarantors only "until" July 9, 2012, after which point they expected to be released. The sentence employs the mandatory term "shall." Moreover, the sentence lacks conditional language such as "if," "provided that," or "on condition that," before the phrase "through the Company's refinancing of the Loan or sale of the Hotel." Thus, the sentence does not express a clear intention to impose a condition on the promise to secure the release. Hence we hold that the "refinancing" and "sale" language constituted a covenant, not a condition precedent. Pirani was bound by the promise to release Gilani, Baharia, and Lalani from their personal guaranties. He did not do so. Thus, the district court did not err in affirming the bankruptcy court judgment that Pirani breached the settlement agreement.

17

No. 15-40538

C.

Pirani next challenges the district court's affirmance of the bankruptcy court's dismissal of his breach-of-guaranty claim against Gilani, Baharia, Lalani, and HNM. The bankruptcy court dismissed the breach-of-guaranty claim on the ground that Pirani should not be permitted to sue the defendants for breach of a guaranty agreement from which he had promised to have them released. This result was correct with respect to Gilani, Baharia, and Lalani. As shown above, Pirani promised to have them released from their personal guaranties—a promise he had the power to fulfill as soon as he received title to the note and guaranty agreement. He cannot "profit from [his] own breach," *Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 186 (Tex. App. 2013), by suing them under a guarantee agreement that he had the obligation and power to release them from. This logic does not extend to HNM, however, because the settlement agreement does not include a promise to release HNM from its guaranty obligations; it promises to release only Gilani, Baharia, and Lalani from their personal guaranties. Hence Pirani's claim for breach-of-guaranty may go forward against HNM.

Pirani seeks to recover HNM's contributive share of the full amount of the post-foreclosure deficiency, which he asserts was $828,190.13. HNM responds in two ways.

1.

First, HNM argues, as an affirmative defense, that there was no deficiency on the note. Pirani responds that bankruptcy court never made a finding on the deficiency issue. Thus, he contends, the issue is not properly before this court on appeal. Under Texas law, any party against whom a deficiency action is brought can "by motion . . . request that the court in which the action is pending determine the fair market value of the real property as of the date of the foreclosure sale." Tex. Prop. Code § 51.003(b). "If the court

determines that the fair market value is greater than the sale price of the real property at the foreclosure sale, then the persons against whom recovery of the deficiency is sought are entitled to an offset against the deficiency" for the amount that the fair market value exceeded the sale price. *Id.* § 51.003(c). The property code provides that the fair market value "shall be determined by the finder of fact after the introduction by the parties of competent evidence of the value." *Id.* § 51.003(b). HNM bears the burden of proof on the issue of fair market value. *See Cabot Capital Corp. v. USDR, Inc.*, 346 S.W.3d 634, 639 (Tex. Ct. App. 2009).

Here, the bankruptcy court never issued findings of fact with respect to fair market value. On appeal, HNM cites to "market value evidence" in the record: (1) documents filed by Pirani in the bank case, including a motion for partial summary judgment, an affidavit from Circle Sherman's real estate agent, and the parties' motion for determination of fair market value; (2) the "Schedule A" that Pirani filed in the bankruptcy proceeding; (3) Pirani's 2011 tax return; and (4) an appraisal by Will Galbraith. In addition to these documents, the record also contains the transcript of Galbraith's testimony in the bankruptcy court trial. Even so, the Texas Property Code specifies that fair market value is a question of fact for the fact-finder. Tex. Prop. Code § 51.003(b). Also, as a "general rule," federal appellate court typically do not consider an issue not passed upon below. *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 993 n.6 (5th Cir. 1999). In addition, although this court has the transcript of Galbraith's testimony, the bankruptcy court is the court that heard the testimony live. For these reasons, we decline to make a factual determination with respect to fair market value in the first instance and leave it to the bankruptcy court on remand to make a factual finding as to the fair market value of the hotel at the time of foreclosure.

No. 15-40538

2.

Second, HNM argues that, even if there is a deficiency, the bankruptcy court correctly held that Pirani cannot sue for the full amount of that deficiency, but rather, is limited to HNM's contributive share of $300,000—the amount that Pirani paid to the bank for the note and guaranty. The guaranty agreement, by its terms, is governed by Texas law. To determine Texas law on the scope of recovery available to a guarantor who purchases an underlying note and sues his coguarantors as an assignee, this court should first look to final decisions of the Texas Supreme Court. *See Howe ex rel. Howe v. Scottsdale Ins. Co.,* 204 F.3d 624, 627 (5th Cir. 2000). Here, no decision of the Texas Supreme Court answers the question, so the court must make an "*Erie* guess" and "determine as best it can" how the Texas Supreme Court would decide the issue. *Id.* (citing *Krieser v. Hobbs*, 166 F.3d 736, 738 (5th Cir. 1999)). In making its *Erie* guess, this court may look to the decisions of Texas intermediate appellate courts, which provide "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (quoting *Labiche v. Legal Sec. Life Ins. Co.*, 31 F.3d 350, 352 (5th Cir. 1994)).

Texas law permits a guarantor to purchase an underlying note and guaranty agreement and assert, as assignee, a cause of action against his coguarantors. *See Byrd v. Estate of Nelms*, 154 S.W.3d 149, 163 (Tex. Ct. App. 2004). In that situation, the guarantor's right to sue as an assignee on the note and guaranty agreement is "limited as a matter of law to the contributive share of its co-guarantors." *Id.* at 165. Contributive shares are calculated by taking the total amount of liability and dividing by the number of coguarantors. *See id.* Here, there were six guarantors: Aziz and Pirani; Gilani, Baharia and Lalani; and HNM. Thus, from each coguarantor, Pirani would be able to recover one-sixth of the amount for which he can make a claim for under the

20

note and guaranty. *See id.* ("There are six guarantors; therefore, Byrd's contributive share would be one-sixth of the note.").

That leaves the question of what amount should form the basis for calculating the contributive shares. Pirani wants to base the calculation on the full amount of the alleged deficiency. He contends that he should be able to sue for the full deficiency because he is suing not as a coguarantor for contribution but as the assignee of the bank. Pirani's position is not supported by Texas law. In *Byrd*, six coguarantors personally guaranteed a note. *See id.* at 153–54. Thereafter, the property securing the note was sold, leaving a roughly $1 million balance on the note. *See id.* at 154. The Nelms Partnership and another coguarantor together paid off the note completely, each paying half of the amount due.[5] *See id.* The Nelms Partnership sued the four other coguarantors on the note and guaranty. *See id.* The court calculated the contributive shares that its coguarantors owed it based on the amount that it had paid—one half of the note—not on the full amount of the note. *See id.* at 165. This was a straightforward application of the principle that "there can be no recover until *after payment* by the party seeking contribution." *McGehee v. Hagan*, 367 S.W.3d 848, 853 (Tex. Ct. App. 2012) (emphasis added); *see also Lavender v. Bunch*, 216 S.W.3d 548, 554 (Tex. App. 2007) ("For well over a hundred years, it has been a 'general and familiar rule of law' that, as among coguarantors, each will bear his proportional part of the burden to the effect that *should one of them pay* more than his proportional part, the others will contribute equally

---

[5] There is a slight discrepancy in the numbers in *Byrd*. The opinion states that the full amount due on the note was $1,052,758. *Byrd*, 154 S.W.3d at 154. It also states that the Nelms Partnership paid half that balance, which would be $526,379. *Id.* Later, though, the opinion states that the Nelms Partnership paid $525,061.47 on the note. *Id.* at 165. The court based the amount that the Nelms Partnership could recover from its coguarantors on the latter figure. *Id.*

to indemnify him for any amount in excess of his proportional part." (emphasis added)). In short, "[t]he assignment of an underlying note and guaranty agreement to a guarantor does not change the status of the guarantor in relation to his co-guarantors." *Byrd*, 154 S.W.3d at 164.

The *Byrd* court also cited approvingly *Mandolfo v. Chudy*, 573 N.W.2d 135, 139 (Neb. 1998), in which the Nebraska Supreme Court held that "assignment does not alter [parties'] status as coguarantors of [a] note." In that case, the intermediate court of appeals had reasoned persuasively as to why a guarantor can sue his coguarantors only for contribution, regardless of having obtained an "assignment" from a creditor. As the court of appeals explained:

> Calling [the transaction with the creditor] a purchase and hiring a lawyer to draft papers to label the transaction as a purchase does not make it such; the reality is that it is a payment of the debt . . . . No matter how many times a farmer calls his cow a horse, it is still a cow. Regardless of labels, be it purchase or payment, cow or horse, the [guarantor is] still limited in [its] rights against [its] coguarantor] by the law which operates between coguarantors.

*Mandolfo v. Chudy*, 564 N.W.2d 266, 272 (Neb. Ct. App. 1997). In keeping with that logic, the *Byrd* court held that "as a matter of law, the relationship between guarantors restricts recovery to their contributive share." *Byrd*, 154 S.W.3d at 164. Contribution is based on what a co-guarantor paid. *See McGehee*, 367 S.W.3d at 853; *Lavender*, 216 S.W.3d at 554. Thus, if HNM fails to prove its no-deficiency defense, then Pirani's recovery should be limited to HNM's contributive share of the $300,000 that Pirani paid for the note and guaranty—that is, $50,000.

D.

Finally, Pirani challenges the district court's affirmance of the bankruptcy court's award of $100,000 in attorney's fees and $10,000 in costs to Gilani, Baharia, Lalani, and HNM. In Texas, attorney's fees are recoverable only when authorized by statute or contract. *See Tony Gullo Motors I, L.P. v.*

No. 15-40538

*Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006). Texas statute provides that a prevailing party on a contract claim "may recover reasonable attorney's fees . . . in addition to the amount of a valid claim and costs." Tex. Civ. Prac. & Rem. Code § 38.001(8).[6] Here, the bankruptcy court made the attorney's fee award under that statute, on the basis of Gilani, Baharia, and Lalani's successful claim for breach of the settlement agreement. Pirani argues that the award should be reversed for two reasons.

First, Pirani argues that the award was not supported by legally sufficient evidence. He cites *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014), for the proposition that, under Texas law, "sufficient evidence" consists of, "at a minimum," evidence of "services performed, who performed them and at what hourly rate, when they were performed, and how much time the work required." Pirani mistakes the method under which the bankruptcy court awarded the fees. The decision in *Long* concerned the proof required under the lodestar method. *Id.* It is true that "a party choosing the lodestar method of proving attorney's fees must provide evidence of the time expended on specific tasks to enable the fact finder to meaningfully review the fee application." *Id.* at 253. Here, however, the court awarded the fees according to the "traditional method," which applies to breach-of-contract claims, and under which "documentary evidence is not a prerequisite." *Metroplex Mailing Servs., LLC v. RR Donnelley & Sons Co.*, 410 S.W.3d 889, 900 (Tex. Ct. App. 2013). Instead, under the traditional approach, Texas courts have "consistently . . . held that an attorney's testimony about his experience, the total amount of fees, and the reasonableness of the fees charged is sufficient to support an award." *Id.* Here, Gilani, Baharia, and Lalani's attorney, Collin Porterfield, testified before the

---

[6] The settlement agreement also provides that the "prevailing party in any action or proceeding brought to enforce any term or provision of [the agreement] shall be entitled to reasonable attorney's fees and expenses[.]"

bankruptcy court about his experience, the time he had to take from other work to work on the case, the total amount of fees, and his opinion as to the reasonableness of the fees. Porterfield's testimony is enough to support an attorney's fee award under the traditional method.

Second, Pirani argues that the evidence produced by Gilani, Baharia, and Lalani failed to adequately segregate the fees attributable to claims for which fees are recoverable under Texas law from those attributable to claims for which they are not. Even under the traditional approach, "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors*, 212 S.W.3d at 313. The only exception to that rule occurs when "discrete legal services advance both a recoverable and unrecoverablee claim." *Id.* at 313–14. In that situation, the fees are considered to be "so intertwined that they need not be segregated." *Id.* at 314.

Here, Porterfield began billing on a flat-fee, rather than an hourly, basis starting in November 2011. He testified that, after that point, he stopped tracking his hours. He also testified that he had not segregated the hours he spent on the breach-of-contract crossclaim from the other claims in the state-court case brought by One World Bank, nor had he segregated the hours spent on the breach-of-contract counterclaim from the other claims in the bankruptcy proceeding. Nonetheless, the bankruptcy court stated:

> The issue of whether Pirani had breached the Settlement Agreement was central to the parties' dispute and intertwined with the parties' various claims and counterclaims. Most of the work done by the defendants' attorney would have been necessary even if they had not asserted other counterclaims and defenses.

This was error. Texas law does not require Porterfield to "keep separate time records" of when he worked on particular claims; instead, an "opinion would have sufficed" stating the percentage of time that would have been necessary

even in the absence of the other claims. *Id.* Here, though, Porterfield provided no such opinion in his testimony. It is "often . . . impossible to state as a matter of law the extent to which certain claims can or cannot be segregated; the issue is more a mixed question of law and fact" for the fact-finder. *Id.* at 313. Thus, "an unsegregated damages award requires a remand." *Id.* at 314. The bankruptcy court on remand should take additional testimony with respect to what percentage of the attorney's fees were attributable to the breach-of-contract claim on which Gilani, Baharia, and Lalani prevailed, or were for work that, while focused on a claim for which fees are not recoverable, also "advanced" the breach-of-contract claim. *Id.* at 313.

## IV.

The order of the district court is affirmed in part and vacated in part. We remand for additional proceedings consistent with this opinion.